TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00170-CR







Sergio Hernandez, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. D-1-DC-07-904087, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



Appellant Sergio Hernandez was tried on a three-count indictment accusing him of
capital murder of a child, felony murder in the course of committing injury to a child, and knowingly
causing serious bodily injury to a child. See Tex. Penal Code Ann. § 19.02(b)(3) (West 2003),
§§ 19.03(a)(8), 22.04(a)(1) (West Supp. 2009). A jury found appellant not guilty of capital murder
but convicted him on the two other counts. The district court assessed punishment for both offenses
at thirty-eight years' imprisonment. Appellant contends that the evidence is factually insufficient
to support the guilty verdicts and that his convictions for both offenses constituted double jeopardy. 
He further contends that the trial court erred by failing to suppress his statements to the police, by
refusing to permit him to impeach a State witness, by overruling his request for an instruction on the
lesser offense of criminally negligent homicide, and by authorizing a felony murder conviction based
on a misdemeanor. Finally, appellant contends that he was denied due process because the State
failed to disclose material evidence. We overrule these contentions and affirm the judgments of
conviction.


BACKGROUND


In December 2003, appellant, who was then seventeen years old, was living with
Teresita Diaz, eighteen years old, and her two-year-old daughter, Lluvia Diaz, in an Austin
apartment. Appellant was not Lluvia's father, but he and Diaz had been living together for about six
months and they both considered him to be the child's step-father.

At 4:25 a.m. on December 3, 2003, appellant and Diaz brought Lluvia to the
emergency room at St. David's Hospital. Dr. Pamela Ashley, the attending physician, testified that
the child had no pulse and was unresponsive. The child's temperature was unusually high,
108 degrees, and there was dry vomit near her nose and mouth. Efforts to revive Lluvia were
unsuccessful, and she was pronounced dead at 4:55 a.m. Ashley testified that appellant and Diaz
reported that the child had been ill for several days, with a fever and vomiting. Given this reported
history, the high temperature, and the absence of any visible injuries, Ashley suspected that Lluvia
may have had meningitis.

According to the protocol followed whenever a child dies suddenly, the hospital
reported Lluvia's death to the medical examiner and the police. Homicide detective Rogelio
Sanchez was dispatched to the hospital. Sanchez testified that he had no reason to suspect foul play,
but the police investigate all sudden child deaths. Sanchez spoke to appellant and Diaz at the
hospital and asked them to come with him to the police station to give statements. They agreed
to do so.

Appellant's statement began at approximately 8:00 a.m. and lasted forty-five minutes. 
Appellant told Sanchez that he was employed as a construction worker and had left for work at
5:00 a.m. the previous day, December 2. He returned home at 4:00 p.m. Diaz had taken Lluvia to
see a nutritionist that afternoon, and they arrived home after he did. Using a borrowed car because
the battery in his car was dead, appellant then drove Diaz to Round Rock, where she worked on the
night cleaning crew at Dell. Lluvia went with them in the car, and she fell asleep in her car seat on
the way home. Appellant and the child got home at about 7:00 p.m. Appellant changed Lluvia's
diaper and put her to bed, where she cried a bit. Appellant went to bed at about 9:00 p.m. Diaz
returned home from work at about 3:30 a.m., and she woke appellant to tell him that something
seemed to be wrong with Lluvia. Appellant initially resisted Diaz's suggestion that they take Lluvia
to the emergency room, recalling that they had been told previously to use the emergency room only
if the child was seriously ill. When Diaz persisted, appellant went to his friend's apartment to see
if he could borrow his car again. The friend would not loan the car, but said that appellant could use
it to jump start his own car. Appellant told Sanchez that neither he nor Diaz ever thought to call 911. 
Appellant also said that the child had been complaining of chest and stomach pains during the
previous weeks, had been eating irregularly, and had vomited the previous Saturday.

The details of Diaz's statement to Sanchez are not in the record. At trial, Diaz
testified that she met appellant while they were both working nights at Dell, and they soon got an
apartment together. Appellant changed jobs about two weeks prior to Lluvia's death, which allowed
him to watch her at night while Diaz worked. Diaz testified that she awoke on the morning of
December 2 after appellant left for work. That afternoon, she took Lluvia by bus to the People's
Clinic, where she had an appointment with the dietician. The appointment had been arranged by her
pediatrician, who also worked at the People's Clinic, because Lluvia was overweight. Diaz testified
that Lluvia appeared to be in good health that afternoon, a fact that was confirmed by the dietician,
Susan Jastrow. Jastrow testified that the child's behavior during the thirty-minute consultation was
normal for a two-year-old. Jastrow said that she did not notice any external injuries to the child. 
Lluvia's pediatrician, Dr. Lewis Appel, testified that the child had been in good health during her
two-year well-child check on November 17, 2003, and that his only concern had been her weight.

Diaz testified that after she and Lluvia returned home that afternoon, appellant drove
her to work at Dell. Diaz said that she got a ride home with a coworker at about 4:00 a.m. As was
her custom, she went straight to Lluvia's bedroom to give her a kiss. This night, the child did not
stir when kissed, and Diaz noticed that she felt hot. Alarmed, Diaz tried to wake her daughter, but
she did not respond. When Diaz tried to sit Lluvia up, the child was limp and appeared to have no
strength. Diaz woke appellant and told him that Lluvia needed to go to the hospital. She testified
that appellant told her that the child was just asleep and nothing was wrong. Diaz then got Lluvia
from her bed and showed her to appellant, and she urged him to go to a neighbor's house to call an
ambulance. (1) Appellant got angry and told Diaz that they would take Lluvia to the hospital in the car. 
Appellant then left the apartment to arrange for transportation. Lluvia periodically stopped breathing
while Diaz waited for appellant to start his car, and she continued to do so on the way to the hospital. 
Diaz testified that the last time this happened, just before they arrived at the emergency room,
Lluvia's breathing did not resume.

Diaz testified that she did not recall telling the emergency room staff that Lluvia had
been sick during the previous week. Diaz said that, in fact, Lluvia had been in good health and had
had no falls or accidents that might have injured her. A neighbor at the apartment complex, Cristina
Martinez Ledesma, testified that she saw Lluvia the day before she died and that she did not appear
to be sick.

Appellant and Diaz left the police station after giving their statements to Sanchez. 
At 11:00 a.m., Sanchez attended the autopsy. The medical examiner, Dr. Elizabeth Peacock, told
Sanchez that Lluvia had suffered craniocerebral trauma, that the injuries had been inflicted within
the last twelve hours of her life, and that she considered the child's death to be a homicide. Sanchez
testified that the police then "went into a murder investigation mode" and a second detective,
Kerry Scanlon, was assigned to the case. It was agreed that Scanlon would reinterview Diaz, while
Sanchez would conduct a second interview of appellant.

Sanchez found appellant at his brother's house. Appellant agreed to go with Sanchez
to the police station for another interview. This interview began at 2:45 p.m. on December 3 and
lasted about five hours. Although Sanchez did not consider appellant to be in custody, he advised
him of his rights before questioning him. During this statement, appellant largely repeated what he
had told Sanchez earlier.

While questioning appellant the second time, Sanchez noticed that appellant's right
hand appeared to be swollen. Sanchez considered this to be significant because Peacock had told
him that the pattern of Lluvia's injuries was consistent with her having been hit with a fist. When
Sanchez asked appellant about his fist, appellant first said that he had hurt it while at work. Later,
he said that he had punched the fender of a car earlier that day. During a break, Sanchez contacted
appellant's brother-in-law, who appellant said had witnessed the incident. The brother-in-law did
not confirm the story. After conferring with Sanchez, Scanlon confirmed with Peacock that the
bruising found in Lluvia's scalp had a pattern that resembled a fist. Peacock also told Scanlon that
the child's tongue had bite marks. Peacock said that it was possible that Lluvia bit her tongue when
her head was injured. 

Scanlon also spoke to Diaz and searched the apartment. Diaz told Scanlon that
appellant had a bad temper, and that he hit things when he was angry. Diaz found the clothes that
Lluvia had been wearing the day before in a laundry hamper. They were damp as if they had been
washed, while the other clothing in the hamper was dry. Diaz said that she had never known
appellant to wash clothes. The sheets and pillowcase on the child's bed had what appeared to be
blood stains. Diaz told Scanlon that the stains had not been there when she left for work the night
before. Tests later confirmed the presence of blood on the sheets, pillowcase, and a blanket. DNA
testing of the blood on the pillowcase, and of other blood found on the child's white blouse and pink
shirt, showed that the blood was Lluvia's.

Peacock testified that after the scalp was reflected during the autopsy, she observed
a "cluster of contusions" on the crown of the skull. When the top of the skull was removed to
expose the brain, she found "extensive left subdural hemorrhage." Peacock stated that most of the
hemorrhaging appeared to be fresh, but she also found areas of healing--evidenced by the presence
of "histiocytes and some fibroblastic-type activity"--that indicated an older injury. She concluded
that there had been two injuries to the brain. "The vast majority of the hemorrhage, both subdural
in the eyes and in the brain itself was all fresh. The only evidence of the older injury was probably
5 percent or less of the subdural." Peacock estimated that the older injury was at least three weeks
old and had not contributed to the child's death. The newer, dominant injury "was fresh within
12 hours" and caused her death. Peacock testified that she also found damage to the hypothalamus,
a portion of the brain that regulates body temperature. This, she said, would account for the
108 degree temperature. Peacock testified that the bruises she observed reminded her of a fist, but
could have been made by some other blunt object. 

Peacock stated that Lluvia died as a result of craniocerebral trauma after striking or
being struck with a blunt object. She testified that the force required exceeded any reasonable
discipline and that the risk of serious injury would have been obvious. Peacock testified that the
symptoms of the injury would have manifested themselves almost immediately, and the child would
have lapsed into unconsciousness within twenty minutes to perhaps two hours.


FACTUAL SUFFICIENCY


Appellant does not deny that the evidence summarized above is legally sufficient to
sustain the jury's verdicts convicting him of murder in the course of committing injury to a child and
injury to a child. He contends, however, that the evidence is factually insufficient to sustain the
guilty verdicts. As in any challenge to the sufficiency of the evidence to sustain a criminal
conviction, the question presented is whether a rational trier of fact could have found the essential
elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979);
Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a factual sufficiency review, all the
evidence is considered equally, including the testimony of defense witnesses and the existence of
alternative hypotheses. Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Orona
v. State, 836 S.W.2d 319, 321 (Tex. App.--Austin 1992, no pet.). Although due deference must be
accorded the fact finder's determinations, particularly those concerning the weight and credibility
of the evidence, the reviewing court may disagree with the result in order to prevent a manifest
injustice. Johnson, 23 S.W.3d at 9; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 
The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak
as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great
weight and preponderance of the available evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex.
Crim. App. 2006); Johnson, 23 S.W.3d at 11.

Appellant argues that his conviction rests on Peacock's testimony that the fatal injury
to Lluvia's brain was caused by a blow to the head, probably with a fist, that occurred no more than
twelve hours before her death, a time when she was alone with appellant. Appellant contends that
other evidence, including other expert medical testimony, contradicts Peacock's conclusions
regarding both the timing and the cause of the fatal injury. Appellant asserts that the guilty verdicts
are manifestly wrong because the overwhelming weight of the evidence supports the conclusion that
Lluvia died as a result of an injury or injuries inflicted days before her death. 

 Appellant relies in part on the testimony of his aunt by marriage, Veronica
Arrendondo, who lived at the same apartment complex as appellant and Diaz. Arrendondo testified
that she saw Lluvia fall on the stairs outside her apartment, striking her head on one of the concrete
steps, a week before she died. Arrendondo further testified that Lluvia had fallen down the stairs
inside Arrendondo's apartment two days before she died, and that she had often seen Lluvia strike
her head on a table while playing. Arrendondo said that Diaz and Lluvia came to her apartment on
the afternoon of December 2 after they returned from the People's Clinic, and that Lluvia did not
seem to be well, she "couldn't open her eyes well." Appellant asserts that Lluvia's death was the
result of these earlier accidental blows to her head, and he urges that the testimony of other medical
experts supports this contention.

The principal expert witness for the defense was Dr. Mark Shuman, an associate
medical examiner for Miami-Dade County, Florida. Shuman reviewed Peacock's autopsy report,
together with the photographs and histology slides. He also reviewed the police reports and Lluvia's
medical records. Shuman agreed with Peacock's conclusion that the cause of death was blunt brain
injury. Shuman also testified that while some of the blood in the subdural hematoma appeared to
be fresh, there were also inflammatory cells and histiocytes in the hematoma that were evidence of
an older injury. Shuman testified that the presence of fresh hemorrhaging did not in itself support
Peacock's conclusion that there had been a blow to the head within twelve hours of death. Shuman
testified that it was impossible to determine whether the child had suffered two distinct blows to the
head, as Peacock concluded, or a single injury days before her death that had continued to bleed. In
this connection, Shuman cited scholarly research suggesting that a person can receive a head injury
resulting in a subdural hematoma but remain lucid and behave normally for several days while the
brain slowly bleeds and swells, ultimately resulting in death. Shuman also testified that he found
nothing distinctive in the pattern of the injuries that would suggest the instrumentality by which they
were inflicted. 

Shuman testified that a blow to the top of the head could result in a contrecoup
injury--an injury opposite the side of the impact--to the hypothalamus. He added that such injuries
most often occur "when the head strikes something rather than when the head gets struck by
something." Although Shuman agreed that an injury to the hypothalamus would account for Lluvia's
elevated temperature, he said that he saw no evidence of injury to the hypothalamus in the autopsy
photographs. Shuman testified that he could not discount the possibility that the elevated
temperature was due to an infection. 

The defense also called Dr. David Dolinak, the chief medical examiner for Travis
County. Dolinak did not participate in the autopsy, but he reviewed the same records that had been
made available to Shuman. Like the other pathologists, Dolinak testified that Lluvia died as a result
of blunt force trauma to the brain. He also agreed that there was evidence of both older and more
recent hemorrhage, and he agreed with Shuman that it can be difficult to determine in such
circumstances whether the fresh bleeding was the result of a new blow to the head or simply renewed
bleeding in an older hematoma. During cross-examination, however, Dolinak testified that it would
be "pretty unusual" for a hematoma to continue to bleed for days or weeks. Dolinak also testified
that there is a difference of opinion among the experts "as to how common it might be for an infant
or young child to have a period of lucidity after a head injury that proves to be fatal." Dolinak
believed that such instances were rare. Unlike Shuman, Dolinak did see evidence of injury to the
hypothalamus. Dolinak testified that given the protected position of the hypothalamus at the base
of the brain, a blow capable of damaging it would result in unconsciousness within minutes. Dolinak
added that it was "hard to believe" that a child could continue to act normally after such a
severe injury.

Dr. James Lukefahr, a pediatrician on the faculty at the University of Texas Medical
School in San Antonio, was called by the State as a rebuttal witness. Lukefahr teaches child abuse
pediatrics and directs a clinic for neglected and abused children. Like the other experts, Lukefahr
believed that Lluvia died as a result of blunt force trauma to the brain. Lukefahr testified that in his
opinion, no single blow could have produced an injury of the shape and severity shown by the
autopsy records. Instead, "it was either multiple blows by a blunt object or multiple blows by a fist." 
With regard to the possibility that Lluvia had experienced a lucid interval of perhaps several days
following the ultimately fatal injury, Lukefahr testified, "My opinion is that she wouldn't have,
because her brain was diffusely injured, and she would really not have had a normal level of
consciousness after her injury."

Contrary to appellant's contention, the other medical experts did not contradict
Peacock's conclusion that the fatal blow to Lluvia's head was inflicted, with a fist or other blunt
object, within twelve hours of death. Even Shuman, the expert most favorable to the defense,
testified only that it was possible that the fatal injury had occurred as the result of a fall days before
the child's death. Both Dolinak and Lukefahr discounted that possibility, testifying that it was
unlikely, if not impossible, that Lluvia could have appeared normal and healthy for days after
suffering the brain injury that ultimately took her life. Furthermore, appellant's alternative
hypothesis rests on the testimony of his aunt, Arrendondo, who was the only witness to Lluvia's
alleged falls during the week preceding her death. The jury could have reasonably discounted
Arrendondo's testimony in light of her family relationship with appellant and her admitted failure
to have brought this information to the attention of the authorities prior to trial. The jury could also
credit the testimony of the witnesses, including the dietician at the People's Clinic, who testified that
Lluvia appeared to be healthy and uninjured on the day preceding her death. Considering all the
evidence in a neutral light, we hold that the State's evidence is not so weak as to make the jury's
verdicts convicting appellant of murder and injury to a child clearly wrong or manifestly unjust. We
further hold that the verdicts are not against the great weight and preponderance of the available
evidence. Point of error one is overruled.

 DOUBLE JEOPARDY


Appellant contends that his convictions for both murder and injury to a child
constitute multiple punishments for the same offense. A defendant suffers multiple punishments in
violation of the Double Jeopardy Clause only when he is convicted of more offenses than the
legislature intended. Ex parte Ervin, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999). Penal code
section 22.04(h) authorizes multiple punishments when a defendant's conduct violates both section
22.04 and another penal code section, even if the two statutes proscribe the "same" conduct. Tex.
Penal Code Ann. § 22.04(h); see Jimenez v. State, 240 S.W.3d 384, 417-18 (Tex. App.--Austin
2007, pet. ref'd) (affirming convictions for felony murder and injury to child); Johnson v. State,
208 S.W.3d 478, 510-11 (Tex. App.--Austin 2006, pet. ref'd) (affirming convictions for capital
murder and injury to elderly person). It is the legislative authorization of multiple punishments
found in section 22.04(h) that distinguishes this case from Littrell v. State, on which appellant relies. 
271 S.W.3d 273, 278-79 (Tex. Crim. App. 2008) (holding that convictions for felony murder and
aggravated robbery constituted double jeopardy). Appellant's eighth point of error is overruled.


FAILURE TO DISCLOSE MATERIAL EVIDENCE


As previously mentioned, the medical experts agreed that a portion of the subdural
hematoma showed signs of aging and healing, thus suggesting that Lluvia had sustained an injury
to her brain days before her death. Appellant asserts that the autopsy report "describes only a single
injury to the child's head, and at no time prior to trial was the defense notified that the [medical
examiner] would be pursuing any other basis or time for that injury." Appellant states that Peacock's
testimony that there had been an older injury "came as a complete surprise to defense counsel." 
Appellant contends that the failure to disclose prior to trial Peacock's finding of two separate injuries
violated the State's constitutional obligation to disclose material evidence favorable to the defense. 
See Brady v. Maryland, 373 U.S. 83, 87 (1963); Harm v. State, 183 S.W.3d 403, 406 (Tex. Crim.
App. 2006). This due process duty to disclose requires the prosecution to disclose exculpatory and
impeachment evidence that is material to either guilt or punishment. Harm, 183 S.W.3d at 406.

The record does not support appellant's contention that the autopsy report contained
no mention of an older injury, nor does it support appellant's assertion in his brief that the report was
"changed" by the medical examiner. The "microscopics" section of the autopsy report stated that
"[s]ections of the dura show mature hemorrhage with infiltrate of acute inflammatory cells and
histiocytes." It was the presence of these inflammatory cells and histiocytes in a portion of the
subdural hematoma, mentioned in the report and shown in the histology slides, that led the medical
witnesses to agree that at least some of the observed injury to Lluvia's brain had occurred days
before her death. (2) Appellant does not deny that the autopsy report and histology slides were made
available to the defense prior to trial. Insofar as the presence of the inflammatory cells and
histiocytes was exculpatory or impeachment evidence, Brady and its progeny were satisfied. 

Appellant's complaint appears to be that he was not told before trial that Peacock
would testify that there were two injuries, a mature one that did not contribute to Lluvia's death and
a recent one that caused her death. We infer that appellant's trial counsel had anticipated that
Peacock would testify that there was only one injury to Lluvia's brain, and that counsel had planned
to use the evidence of mature hemorrhage to show that the injury had been inflicted days before
death and at a time when persons other than appellant had custody of the child. But a defendant has
no general due process right to advance notice of inculpatory evidence that the State intends to use
at trial. Hall v. State, 283 S.W.3d 137, 163 (Tex. App.--Austin 2009, pet. ref'd) (citing Weatherford
v. Bursey, 429 U.S. 545, 559-61 (1977)). Peacock's failure to testify as counsel had anticipated did
not, on this record, violate appellant's due process rights. Point of error five is overruled.


ADMISSION OF STATEMENTS


Appellant brings forward two points of error urging that the trial court erred by
overruling his motion to suppress his two videotaped statements to Sanchez. It will be recalled that
Sanchez first questioned appellant at 8:00 a.m. on December 3, three hours after Lluvia
was pronounced dead. Appellant was not advised of his rights at this interview, which lasted
forty-five minutes. Sanchez questioned appellant a second time at 2:45 p.m. that same day, after the
medical examiner determined that the death was a homicide. Appellant was advised of his rights
at the start of this interview, which lasted about five hours. In point of error two, appellant contends
that Sanchez engaged in the "question first, warn later" tactic condemned in Missouri v. Seibert,
542 U.S. 600 (2004). In point of error three, appellant urges that Sanchez failed to adequately advise
him at the time of the second interview that he could still invoke his right to remain silent despite
having made the earlier statement.

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. 
State v. Dixon, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). This means that the ruling will be
upheld if it is reasonably supported by the record and is correct under any applicable legal theory. 
Id. The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight
to be given their testimony. State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give the trial court almost complete
deference in determining historical facts, but we review de novo the trial court's application of the
law to those facts. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

Appellant filed a pretrial motion to suppress evidence, including "video and/or
audio tapes . . . produced in violation of the procedures set out in" the United States and
Texas constitutions and the code of criminal procedure. A hearing on the motion was held on
April 9, 2007, and Sanchez was the only witness. Sanchez testified, as he later testified at trial, that
he was initially told that Lluvia had died of acute meningitis. Sanchez said that he told appellant and
Diaz at the hospital that he "wanted to interview them to get a statement, basically, from both of
them concerning the events prior to the child's death." Sanchez testified that both appellant and Diaz
agreed to make a statement, that they went to the police station voluntarily, and that neither of them
was under arrest. We have already summarized the contents of appellant's first statement. Sanchez
testified that after taking this statement, he had no reason to be suspicious about the cause of Lluvia's
death. Later that day, however, after learning of the medical examiner's findings and conclusions,
Sanchez sought out appellant for further questioning. Sanchez testified that appellant agreed to
return to the police station and went there voluntarily. He was not handcuffed or under arrest. 
Although Sanchez did not consider appellant to be in custody, he advised him of his rights as
prescribed by Miranda and article 38.22. See Miranda v. Arizona, 384 U.S. 436 (1966); Tex. Code
Crim. Proc. Ann. art. 38.22, § 2(a) (West 2005). As appellant notes in his brief, the second interview
was "more adversarial and repetitive but contains virtually identical questions and substantially
similar answers" as the first. Sanchez testified that he did not consider appellant to be in custody
until, near the end of the interview, he learned that an arrest warrant had been issued and he told
appellant that he was under arrest.

Appellant's principal argument at the suppression hearing was that he did not
understand his rights as they were explained by Sanchez, and therefore he did not knowingly and
voluntarily waive those rights before giving the second statement. The court took the matter under
advisement and asked the parties to "file some law" speaking to whether appellant was in custody
and whether he knowingly waived his rights. Defense counsel filed a trial brief urging that appellant
was in custody at the time of the second statement, that he was not adequately advised of this rights,
and that the waiver of rights was not knowing and voluntary. The court later filed a written order
overruling the motion to suppress. The order states that "the question of custody is irrelevant since
the defendant was properly warned and knowingly and intelligently waived his rights and voluntarily
provided a statement to the officer."

In Seibert, the Supreme Court summarized the issue and its holding as follows:


This case tests a police protocol for custodial interrogation that calls for
giving no warnings of the rights to silence and counsel until interrogation has
produced a confession. Although such a statement is generally inadmissible, since
taken in violation of Miranda . . . , the interrogating officer follows it with Miranda
warnings and then leads the suspect to cover the same ground a second time. The
question here is the admissibility of the repeated statement. Because this midstream
recitation of warnings after interrogation and unwarned confession could not
effectively comply with Miranda's constitutional requirement, we hold that a
statement repeated after a warning in such circumstances is inadmissible.



542 U.S. at 604 (citation omitted). Among the factors the Court considered in determining that the
"midstream" warnings were not sufficient to effectively comply with Miranda were the completeness
and detail of the first, unwarned statement, the overlapping content of the two statements, the timing
and setting of the two statements, the continuity of police personnel, and the degree to which the
interrogator treated the second round of questioning as a continuation of the first. Id. at 615. (3)

In his points of error, appellant contends that Sanchez engaged in the two-step,
"question first, warn later" interrogation technique at issue in Seibert. He further contends that,
for the reasons discussed in Seibert, the Miranda warnings he received before he made his
second statement were not adequate to ensure that he knowingly and voluntarily waived his
Fifth Amendment rights. These contentions fail because appellant has never contended, either in his
arguments at the suppression hearing, in his trial brief, or in his brief to this Court, that he was in
custody when he made his first statement to Sanchez. (4) Because the uncontradicted evidence supports
a finding that appellant was not in custody during the first interview, Sanchez's failure to advise him
of his rights at that interview did not violate Miranda or article 38.22. See Miranda, 384 U.S.
at 444-45; Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2, 3. Because there was no violation of
Miranda or article 38.22 when appellant gave his first statement, there was no need for Sanchez
to take "curative" measures beyond advising appellant of his rights to ensure that appellant's
Fifth Amendment rights were fully protected when he made his second statement.

The trial court found that appellant "was properly warned and knowingly and
intelligently waived his rights and voluntarily provided a statement to the officer." The record
supports this finding. Points of error two and three are overruled.


IMPEACHMENT


Appellant contends that the trial court erred by refusing to allow him to impeach Diaz
with evidence that she had used a false name to receive government health-care benefits. Appellant
urges that using a fictitious name to receive government benefits is a crime of moral turpitude and
therefore admissible for impeachment under rule 609. Tex. R. Evid. 609(a).

Appellant's reliance on rule 609(a) is misplaced because that rule permits
impeachment by evidence of a criminal conviction. Appellant did not claim or show that Diaz had
been convicted of any crime arising out of the alleged conduct. Appellant urges no other basis for
the disallowed impeachment. Point of error four is overruled.


LESSER INCLUDED OFFENSE


Appellant contends that the trial court erred by refusing to instruct the jury on the
lesser included offense of criminally negligent homicide. See Tex. Penal Code Ann. § 19.05 (West
2003). The indictment contained three counts accusing appellant of capital murder, felony murder,
and injury to a child, and all three counts were submitted to the jury. As to each count, we must
determine whether criminally negligent homicide was included within the offense alleged in the
indictment. Hall v. State, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). The second step in the
analysis is to determine whether there was evidence that would permit the jury to rationally find that
appellant, if guilty at all, was guilty only of the lesser included offense. Id. at 536; Rousseau v. State,
855 S.W.2d 666, 673 (Tex. Crim. App. 1993).

Criminally negligent homicide is a lesser included offense of capital murder. 
Cardenas v. State, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000). However, because appellant was
acquitted on the capital murder count, we need not decide if the evidence raised an issue as to
whether appellant was guilty only of the lesser included offense. An instruction on criminally
negligent homicide would have given the jury an opportunity to convict appellant of the lesser
offense rather than acquitting him of capital murder. As to count one, any error in refusing the lesser
included offense instruction was clearly harmless. See Tex. R. App. P. 44.2(b).

Using the "cognate-pleadings" analysis adopted by the court of criminal appeals, we
conclude that criminally negligent homicide was not a lesser included offense of the felony murder
alleged in count two. See Hall, 225 S.W.3d at 535-36. To convict appellant on this count, the State
had to prove that: (1) appellant caused Lluvia's death by striking her with his fist or a blunt object,
(2) striking the child in this way was an act clearly dangerous to human life, and (3) this clearly
dangerous act was committed in the course of or in furtherance of appellant's commission or attempt
to commit felony injury to a child by intentionally, knowingly, or recklessly causing bodily injury
to the child by striking her with his hand or a blunt object. Penal code section 19.03(b)(3), which
defines the offense of felony murder, plainly dispenses with a culpable mental state. Lomax v. State,
233 S.W.3d 302, 305 (Tex. Crim. App. 2007). Thus, the State was not required to prove appellant's
culpable mental state with regard to either (1) the child's death or (2) the act clearly dangerous to
human life. See id. at 307 & n.16. Penal code section 19.05, on the other hand, requires proof that
the defendant caused the deceased's death by criminal negligence. For this reason, criminally
negligent homicide could not be proved by the same or less than the facts required to prove the
alleged felony murder. See Tex. Code Crim. Proc. Ann. art. 37.09(1) (West 2006).

Similarly, criminally negligent homicide was not included within the injury to a child
offense alleged in count three. To convict appellant on this count, the State was required to prove
that he knowingly caused serious bodily injury to a child fourteen years of age or younger by striking
her with his hand or a blunt object. Criminally negligent homicide requires proof of a fact, the
child's death, that cannot be established by proof of the same or less than the facts required to prove
the commission of felony injury to a child.

The trial court did not err by refusing to authorize appellant's conviction for
criminally negligent homicide as a lesser included offense of felony murder and injury to a child. 
Any error in refusing to authorize appellant's conviction for criminally negligent homicide as a lesser
included offense of capital murder was harmless. Point of error six is overruled.


MISDEMEANOR MURDER


Finally, appellant contends that the trial court's charge erroneously permitted the jury
to convict him of felony murder based on an underlying misdemeanor offense. In pertinent part, the
charge authorized appellant's conviction for felony murder if the jury found that he caused Lluvia's
death in the course of committing "the felony offense of injury to a child, by then and there
intentionally or knowingly causing bodily injury to Lluvia Diaz, a child fourteen years of age or
younger." (5) Intentionally or knowingly causing bodily injury to a child is, and was in 2003, a third
degree felony. Tex. Penal Code Ann. § 22.04(f) (West Supp. 2009). Thus, contrary to appellant's
contention, the trial court did not authorize his conviction for felony murder based on an underlying
misdemeanor offense. Point of error seven is overruled.

The judgments of conviction are affirmed.



 ___________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: April 23, 2010

Do Not Publish
1. Appellant and Diaz had no phone.
2. The clearest explanation was provided by Dr. Dolinak, who testified that histiocytes are a
special form of cell used by the body to "eat up the red blood cells" in a hematoma. The presence
of histiocytes and related cells are evidence that a hematoma "has been there for at least a few days,
probably longer."
3. Justice Kennedy, who was the critical fifth vote in Seibert, stressed in a concurring opinion that
the interrogating officer had deliberately violated Miranda when he took the first statement, and he
said that different considerations would apply if the Miranda violation had been inadvertent. 
Missouri v. Seibert, 542 U.S. 600, 620-21 (2004). The court of criminal appeals has adopted
Justice Kennedy's concurring opinion and held that Seibert applies only when the police deliberately
employ the "question first, warn later" technique to circumvent Miranda. Carter v. State,
No. PD-0606-09, 2010 Tex. Crim. App. LEXIS 101, at *17 (Tex. Crim. App. Mar. 24, 2010). When
the initial Miranda violation is inadvertent rather than deliberate, a second statement given after the
required warnings is admissible if the post-warning statement was voluntarily made. Seibert,
542 U.S. at 620 (Kennedy, J., concurring) (citing Oregon v. Elstad, 470 U.S. 298 (1985)); Carter,
2010 Tex. Crim. App. LEXIS 101, at *29.

4. Although appellant contends that his first statement should have been suppressed, his brief
contains no argument pertinent to this contention.
5. The application paragraph did not strictly track the indictment, which alleged in count two that
appellant caused Lluvia's death in the course of committing or attempting to commit "the felony
offense of Injury to a Child, by then and there intentionally and knowingly and recklessly causing
bodily injury to Lluvia Diaz, a child fourteen years of age or younger." Recklessly causing bodily
injury to a child is and was a state jail felony. Tex. Penal Code Ann. § 22.04(f) (West Supp. 2009).